UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| HORIZON SHIPBUILDING INC, | § | |
| | § | |
| Appellant, | § | |
| VS. | § | CIVIL ACTION NO. C-12-60 |
| | § | |
| BLYN II HOLDING LLC, | § | |
| | § | |
| Appellee. | § | |

## OPINION

Finding that the issues have been adequately articulated in the parties' briefs, the Court **DENIES** oral argument of this appeal.  For the reason set out below, the Court **AFFIRMS** the Bankruptcy Court's holding that Horizon Shipbuilding, Inc. (Horizon) breached its duty as substitute custodian of the vessel Betty Lyn II, and **MODIFIES** the damage award in favor of BLyn II Holding, L.L.C. (BLyn).  The Court **AFFIRMS** the Bankruptcy Court's judgment regarding the contract claims and Horizon's claim for expenses *in custodia legis*.

## OVERVIEW

While the issues presented to this Court on appeal are fairly narrow (compared to the breadth and depth of the issues originally brought in the three proceedings that were consolidated for trial), it is important to note the context in which the issues arose:

Since April of 2008, the Betty Lyn II (a 131-foot vessel built in 1974) has been in limbo . . . in drydock . . . in Alabama—no longer a crew boat, but not yet a yacht. Disassembled, with renovations woefully incomplete, she has been deteriorating with

time and poor treatment.  Her sad condition is a saga in which there is plenty of blame to go around.

The vessel's owner, BLyn, is comprised of four businessmen who purchased the vessel for $680,000 in December, 2005.  Their objective was to refit the vessel, register it in the Marshall Islands, and offer it for high-end charters at a rate of $75,000 - $150,000 per week.  But none of the businessmen had any experience with refitting a vessel, much less refitting one that was old and in disrepair, with the end goal of producing a luxurious yacht.  They did not understand the scope of the project and started down the refit road without a clear idea of their destination.  It seems that there are quite a few optional details in yacht-building—expensive details.  Despite their success in other endeavors, the BLyn members did not know how to manage this project.

BLyn engaged the services of Jon Overing of Overing Yacht Designs, LLC (Overing) to put the project together.  Overing, a well-respected and experienced marine architect, suggested that BLyn select Horizon, a successful commercial shipyard that was experienced with aluminum hulled vessels like the Betty Lynn II to execute the refit work.  Horizon's owner wanted to enter the yacht market under the name "Crimson Yachts," an unincorporated division of Horizon.  When BLyn contracted with Horizon, Horizon received its first yacht project.  Because it was a refit of an old vessel that would inevitably reveal unpredictable problems as the project progressed, the contract was on a time and materials basis rather than a fixed price.

On August 1, 2006, Horizon and BLyn executed a Contract for Refurbishment, Rehabilitation, Overhaul and Outfitting of the Betty Lyn II (Refit Contract), which

established hourly rates for workers.  Materials would be provided on a cost plus fifteen percent (15%) basis, and the project would be completed in fifteen (15) months.  The estimated budget was $4,500,000, based on the initial, very general specifications and profile drawings.  Horizon then hired a project manager with experience in yacht refits, who was to supervise and translate the forthcoming, specific architectural and engineering drawings into actual work done by teams of ship-builders and craftsmen.

BLyn obtained a $6,000,000 loan from Encore Bank to fund the vessel refit and paid Horizon a down payment of $180,000.  BLyn's ultimate expectation, supported by a marine surveyor's expert opinion, was that the yacht would be worth over $10,000,000 when complete.

BLyn delegated most of its portion of the project management to the vessel's Captain, Doug Dardeau.  On behalf of BLyn, Dardeau monitored the workers on the vessel, reviewed and approved invoices before transmitting them to BLyn's manager for payment, and signed change orders reflecting substantial additional work that was required as four factors came in to play:  (1) Overing's architectural and engineering drawings, which provided additional detail as to the yacht's custom features; (2) BLyn's changing preferences and increasing demands for top-of-the-line elements; (3) the Marshall Island Vessel Registrar's requirements for registration approval; and (4) the revelation of greater and greater problems with the vessel's infrastructure, as the workers got further and further into the renovation.  While Captain Dardeau labored to take the project in the direction his employer demanded and followed his instructions to oversee

and verify the work being done, he could not or did not communicate effectively with the inexperienced BLyn members about the escalating scope of the project.

Almost immediately, the refit ran into problems. Without explanation, Overing's drawings were delayed and often required revisions because of poor quality. Horizon was three (3) months into the project before receiving the first of the 43 necessary drawings. Overing testified that drawing delays were standard operating procedure—something to be expected in yacht-building. In contrast, Horizon had no end of complaints about the delays and about the sequencing and quality of Overing's work. Depending on who you talked to, either Horizon did not know how to sequence the trades required for yacht-building or Overing was arbitrary in addition to dilatory in completing the drawings, which trickled in slowly to Horizon. In July, 2007, Horizon explained to BLyn that it could no longer work with Overing—that Overing had to be replaced or BLyn needed to take the Betty Lyn II to another shipyard. BLyn fired Overing and hired Applied Marine Designs to finish the architectural work with the assistance of Horizon's in-house engineer. That was not a cure-all. In September, 2007—over a year into the 15-month contract—BLyn was still trying to decide how many staterooms and heads (bathrooms) it wanted to configure in the design. Horizon sought to extend the contract period to a total of thirty (30) months, while representing late into the process that the work could still be completed "on time."

In February, 2008, the remaining drawings were completed and Horizon used them to revise its projections. The resulting accumulated estimate for the Horizon work was $9,400,000. The Encore Bank financing was exhausted and Encore refused to

increase the loan, having lost confidence in Horizon's ability to complete the project. BLyn stopped paying Horizon invoices and, on April 16, 2008, issued a stop work order.

When their differences could not be resolved, Horizon sued BLyn in Alabama state court to establish a maritime lien for payment of three unpaid invoices, along with the ten percent (10%) retention on previously paid invoices, all for work done prior to the stop work order. The total amount outstanding was $1,155,617.38, plus interest and attorney's fees and less the initial deposit. The Betty Lyn II was arrested and Horizon was appointed as her substitute custodian. BLyn filed for relief under Chapter 11 of the United States Bankruptcy Code, fired Dardeau and hired a new Captain.

Since then, the Betty Lyn II has languished at the Horizon shipyard. When the vessels being built around her were ready to move, the Betty Lyn II was in the way. So, claiming it had no alternative, Horizon launched the Betty Lyn II, despite the vessel's unfinished and unprotected state and the lack of a proper dock. Horizon left her in the saltwater for three months while the other vessels were rearranged and launched. Then the Betty Lyn was returned to drydock, worse for the wear, where she remains today. Because water accumulated in the bilges and moisture infiltrated the poorly protected windows, doors, and hatches, the vessel's insulation and plywood panels are moldy and parts of the brand new mechanical systems are covered in rust.

The Bankruptcy Court rejected BLyn's complaints about Horizon's performance under the contract. With the exception of an overbilling error on some of the charges for workers' hourly rates, the Court determined that the time and material charges were consistent with the contract and with BLyn's demands. The Court further agreed with

5 / 32

Horizon that it was entitled to payment of the remaining unpaid invoices and the retainage from previously paid invoices.

However, it was a different matter when the Bankruptcy Court looked at Horizon's performance as a substitute custodian of the vessel. The Court held that Horizon had breached its duty of ordinary care and assessed the damages at $1,000,000. Thus Horizon's contract recovery against BLyn was substantially reduced by the custodian breach-of-duty offset.

Horizon has appealed to this Court, claiming that there is no evidence or insufficient evidence to support the Bankruptcy Court's finding that Horizon breached its duty as a substitute custodian or that its breach caused $1,000,000 in damages. Horizon also claims error in the Bankruptcy Court's failure to award its custodial expenses. BLyn has filed a cross-appeal, challenging the Bankruptcy Court's refusal to require Horizon to reimburse BLyn for a number of charges that it paid, but which its auditor testified were improper under the terms of the Refit Contract or under general accounting principles.

## JURISDICTION

The Final Judgment was entered by the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division on February 8, 2012. D.E. 2-72. This Court has jurisdiction over appeals from such judgments pursuant to 28 U.S.C. § 158. Horizon timely filed its Notice of Appeal pursuant to Bankruptcy Rule 8002(a) on February 17, 2012. D.E. 2-73. BLyn timely filed its Notice of Cross-Appeal on March 2, 2012. D.E. 2-110.

## STANDARD OF REVIEW

The District Court's review of a Bankruptcy Court's decision is governed by Bankruptcy Rule 8013, which states:

> On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

A finding of fact is clearly erroneous when, after reviewing the entirety of the evidence, the reviewing court is left with the definite and firm conviction that, although there is some evidence to support it, a mistake has been made in a fact finding. *Jarvis Christian College v. Nat'l Union Fire Ins. Co.*, 197 F.3d 742, 746 n.4 (5th Cir. 2000). The "clearly erroneous" rule will not insulate a finding that is premised upon an improper legal standard. *In re Dunham*, 110 F.3d 286, 289 (5th Cir. 1997); *In re Bradley*, 960 F.2d 502, 507 (5th Cir. 1992), *cert. denied, Commonwealth Land Title Ins. Co. v. Bradley*, 507 U.S. 971, 113 S.Ct. 1412, 122 L.Ed.2d 783 (1993).

Questions of law, of course, are reviewed *de novo*. *E.g., Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991); *Weir v. Federal Asset Disposition Ass'n*, 123 F.3d 281, 285 (5th Cir. 1997). The *de novo* standard also applies to mixed questions of fact and law, as well as to questions concerning the application of law to fact. *See In re National Gypsum Co.*, 208 F.3d 498, 504 (5th Cir.), *cert. denied*, 531 U.S. 871 (2000); *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1021 (5th Cir. 1999).

## DISCUSSION

### A.  Horizon Breached Its Duty as Substitute Custodian

Horizon claims that the finding of its breach of duty must be reversed because BLyn failed to offer sufficient evidence of the standard of care owed by a substitute custodian to secure and safeguard a vessel.  This argument fails for two reasons.  First, duty is generally a question of law.  *See Theriot v. United States*, 245 F.3d 388, 400 (5th Cir. 1998); *Targa Midstream Services L.P. v. K-Sea Transp. Partners, L.P.*, 527 F.Supp. 2d 598, 602 (S.D. Tex. 2007) (holding that standard of care in maritime negligence is a question of law).  Second, the parameters of that duty are not matters that necessarily require expert testimony.  *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (*per curiam*; stating that expert testimony in maritime negligence case is not required where standard of care related to duty is informed by common sense and knowledge of the world); *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004); *Dimoff v. Maitre*, 432 So.2d 1225, 1226-27 (Ala. 1983).

Horizon concedes that the duty owed by a substitute custodian involves the same well-established standard of care that pertains to the United States Marshal:  to keep the property in a safe and secure manner, so as to protect it from injury so that its value to the parties will not be impaired by unnecessary deterioration or damage.  *Material Service & Transp. Co. v. Schneider*, 129 F.2d 392, 394 (3rd Cir. 1942).  It is a matter of "reasonable care under the circumstances."  *See Scotiabank De Puerto Rico v. M/V ATUTI*, 326 F. Supp.2d 282, 284 (D. Puerto Rico 2004); *New River Yachting Center, Inc. v. M/V Little Eagle II*, 401 F.Supp. 132, 135-36 (D. Fla. 1975) (mem. op.).  The custodian is not

charged with preventing normal wear and tear or depreciation. *Scotiabank, supra* at 285. Neither is it responsible to continue repairs or to make improvements. *Id*. The Bankruptcy Court's statement of the duty was correct. D.E. 2-71, p. 28, ¶ 36.

Despite acknowledging that the question of reasonable care under the circumstances is one of negligence,[1] Horizon suggests that the trier of fact is incapable of assessing what is negligence with respect to the care of a vessel without expert guidance. In that regard, Horizon asserts that the question involves specialized equipment and techniques unfamiliar to the ordinary person and thus can only be established by expert witnesses. *FFE Transportation Services, Inc., supra* at 92; *Simmons v. Briggs Equipment Trust*, 221 S.W.3d 109, 114 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The damage that BLyn complains of, and which concerns this Court, has to do with mold and mildew in the insulation and plywood, the wicking of water up the plywood on the walls, standing water in the interior and bilges, rust on new equipment, and marine growth, such as barnacles, on the vessel's bare aluminum hull. The obvious cause of this damage is the failure to make windows, doors, and hatches sufficiently water-tight, the failure to utilize appropriate dehumidifiers and bilge pumps, and the launching of the vessel when it was not properly painted and protected from saltwater and the marine organisms that live therein.

These are not matters of technological mystery to the ordinary person. It does not take an expert to describe how tape and plastic can be used to cover openings and how

---

[1] Horizon's principal brief, D.E. 3, p. 15.

holes in plastic defeat the purpose.  It does not take a scientist to describe how to plug in a dehumidifier and empty the water from time to time.  It does not take a marine biologist to describe how barnacles attach to the hulls of boats and are hard to remove.  A breach of duty on those bases can be evaluated and assessed by laypersons.

In contrast, if the question had to do with damage to the aluminum hull for failure to use zinc anodes in saltwater, a metallurgist's testimony might be required.  *See generally*, Glass, D.E. 2-63, pp. 37-38.  However, because Horizon did use zinc anodes and there is no evidence of metallurgical deterioration as a result of the launch, no breach of duty needs to be assessed on that scientific issue.  No damages are being awarded on such a theory.

An expert is permitted to testify if that person's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).[2]  Here, no such testimony is required to adjudicate the case.  Thus BLyn's failure to designate experts or offer such expert testimony does not defeat its claim for damages based on a breach of the duty of a substitute custodian.

Moreover, the testimony and the conduct of Horizon's own personnel provided adequate proof of its breach.  For instance, it is clear that Horizon did use some tape, plastic, and plywood to cover windows, doors, and hatches, as well as the brand new engines.  *E.g.*, BLyn Ex. 118, Bates # 5363, 5364, 5376, 5463, 5473, 5475, 5548.  This indicates its own understanding that the openings should be sealed and new equipment

---

[2]  Pursuant to Bankruptcy Rule 9017, the Federal Rules of Evidence apply to bankruptcy proceedings.

should be protected.  However, by doing such things as using warped plywood that did not fully cover the openings and by trying to seal windows from the inside thus allowing moisture through the outside wall, Horizon's efforts were obviously inadequate.  D.E. 2-65, p. 10; BLyn Ex. 118, *passim.*

Horizon had dehumidifiers on board the vessel, but did not have them plugged in and working.  Connell, D.E. 2-48, p. 10.  Horizon's own project manager, Ben Forrest, would have been "jumping up and down" to prevent a shipyard from launching his vessel without proper paint on the bottom, yet permitted the launch of the Betty Lyn II in its unprotected state.  Forrest, D.E. 2-63, pp. 200-01.  Horizon clearly breached its duty of care as a substitute trustee and the Bankruptcy Court did not need expert testimony to guide it.

The Court **OVERRULES** Horizon's Issue 1, which complains of error in the sufficiency of the evidence to support the determination of the standard of care of a substitute custodian.  The Court **OVERRULES** Horizon's Issue 2, which complains of error in the sufficiency of the evidence to support the determination that Horizon breached the standard of care owed by a substitute custodian.  The Court **AFFIRMS** the determination that Horizon breached its duty to BLyn as a substitute custodian of the vessel, Betty Lyn II.

**B.  The Bankruptcy Court's Finding of Damages Is Erroneous**

Horizon challenges the Bankruptcy Court's award of $1,000,000 as damages for its breach of duty as a substitute trustee.  Because the cause of action is in the nature of a negligence claim, the question is the amount of damages actually and proximately caused

to BLyn by Horizon's breach of duty. *E.g., Gonzalez v. National Ins. Crime Bureau*, 427 Fed. Appx. 394, 397, 2011 WL 2206700, *3 (5th Cir. 2011) (citing *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)); *Belew v. United States*, 263 Fed. Appx. 1, 2, 2007 WL 3023127, *2 (11th Cir. 2007) (citing *Martin v. Arnold*, 643 So.2d 564, 567 (Ala. 1994)).

The Bankruptcy Court correctly criticized the parties' expert opinions as utilizing incorrect standards. BLyn's experts attributed all repair needs of the vessel to Horizon's breach of its custodial duties, failing to take into account that some repairs were based on remediating pre-custodial work by Horizon and that deterioration would ordinarily flow from oxidation and general exposure to the elements with the mere passage of time. See Findings of Fact, D.E. 2-71, p. 15, ¶ 59. Horizon's expert, in contrast, attributed the criticism of the vessel's condition to ordinary wear and tear and BLyn's stop work order, which prevented Horizon from finishing the work that had been started. Horizon fails to acknowledge that its shoddy efforts to protect the vessel contributed to its deterioration and the needed repairs. *Id*.

As the Bankruptcy Court correctly observed, the standard is what damages were proximately caused by the breach of the duty of a custodian. *Gonzalez, supra*; *Belew, supra*. Horizon cannot be charged with failing to continue the repairs and renovations after the stop work order and cannot be charged with the damage caused by the passage of time in drydock. *Scotiabank, supra* at 285. The question is how much of the poor condition comes from a failure to keep the vessel safe and secure, and failing to use reasonable efforts to prevent deterioration. The burden of proof for this issue lies on

BLyn, the claimant.  *E.g., Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009); *Jones v. General Motors Corp.*, 557 So.2d 1259, 1263 (Ala. 1990).

BLyn's stop work order was issued April 16, 2008.  Horizon did not terminate the contract until May 24, 2008 after BLyn failed to respond to Horizon's final pre-suit demand for payment of outstanding invoices.  Horizon was then appointed as substitute custodian on June 12, 2008.  BLyn's experts did not evaluate the vessel immediately, but Thomas Glass of Roscioli Yachting Center, Inc. assessed the Betty Lyn II in March, 2009 prior to its launch, and there were several expert witness visits to the vessel by Glass and Robert Connell after the launch.

Damage to the vessel may be shown by several methods, the most salient of which are the cost of repair and the diminution in value from the time that Horizon was appointed as custodian to the date of trial.  *City of Tyler v. Likes*, 962 S.W.2d 489, 496-97 (Tex. 1997); *Southwestern Motor Transp. v. Valley Weathermakers, Inc.*, 427 S.W.2d 597, 600 (Tex. 1968); *Alford v. Jones*, 531 So.2d 659, 661 (Ala. 1988).  There was no evidence offered as to the second valuation method.  So the Bankruptcy Court was provided only a cost of repair method, and that Court clearly made its finding as an amount "to repair the vessel."  Findings of Fact, D.E. 2-71, pp. 15-16, ¶ 59.

BLyn defends Horizon's appeal on this issue, complaining that Horizon waived its damages issue by failing to object to the lack of specific findings that would provide a more detailed accounting of damages or by failing to object to the experts' methodologies.  BLyn Brief, D.E. 4, p. 15.  BLyn did not, however, support this argument with citation of authorities, thus waiving it.  *E.g.*, Fed. R. App. P. 28(a); *L&A

*Contracting Co. v. Southern Concrete Services, Inc.*, 17 F.3d 106, 113 (5th Cir. 1994); *Dardar v. Lafourche Realty Co., Inc.*, 985 F.2d 824, 831 (5th Cir. 1993).  Moreover, "A party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings."  Fed. R. Civ. P. 52(a)(5).  There is no requirement that a party in a civil case request more specific findings before challenging them.

Any finding must be based on the evidence.  BLyn's suggestion that the Bankruptcy Court could arrive at any number for damages, based on listening to the litany of complaints made about Horizon's custodianship and the condition of the Betty Lyn II, is an invitation to the Court to speculate.  Unless there is evidence of (1) a repair that needs to be made as a proximate result of substandard conduct and (2) the cost of making that repair, the Court does not have a basis for a proper finding.  For instance, evidence that the vessel was docked outside the shipyard's perimeter and had no security or fire suppression precautions is some evidence of a breach of duty.  But without evidence that there were injurious intruders or fires, no damages finding follows.  Likewise, there were no fenders to protect the side of the vessel from the pilings of the dock, yet no indication that any damage was done to the Betty Lyn II as a result.  D.E. 2-65, pp. 7-8.  Thus, a damages finding on that basis would be speculative.

BLyn's experts compiled a list of proposed repairs that supplies a maximum figure for any damages calculation related to custodial care.  The list of repairs is included in the report prepared by Thomas Glass, dated April 8, 2010.  Robert Connell also relied on the figures in that report.  The listing shows a total of $1,311,560.00 in repairs needed before

the vessel refit could resume.  D.E. 2-41, p. 12.  However, nothing in the report segregates repairs necessary because of poor storage from those required to remedy complaints regarding Horizon's contractual work or those required simply by the passage of time.  In fact, Glass testified that the most damage, both inside and outside, was due to the passage of time.  D.E. 2-63, pp. 62-63.  Each category will be addressed in the order in which it was included in the report.

**Exterior—Sand, Sweep and/or Blast to Bright Metal.**  There is no question that the launch of the Betty Lyn II caused problems for the bottom, which was submerged in what has been described as brackish saltwater.  It is undisputed that there were barnacles and other marine growth on the bottom that would have to be removed before paint fairing could be completed.  *E.g*., Glass, D.E. 2-63, pp. 34-35; Photographs, BLyn Ex. 118, Bates # 5496, 5503, 5505, 5509.  Of the paint-related expenses, Glass assigned $9,500 in extra sandblasting of the bottom to the damage done by launching the vessel. D.E. 2-63, p. 35, 54.

Glass testified that his estimated costs for paint (priming and fairing) went up $361,000 between March 2009 and April 2010.  Glass, D.E. 2-63, p. 88.  However, he did not articulate a basis for that rise in cost that related to Horizon's custodial conduct. Rather, Glass admitted that any yacht fairing and painting job would involve the removal of old paint and fairing and the sandblasting of the hull to "bright metal" in order to prepare the surface for the new paint—a procedure that would be done regardless of any damage caused by the launch.  Glass testified to this procedure as necessary to get the

multiple coats of fairing, paint, and anti-fouling coats to adhere to the vessel and to be eligible for the paint manufacturer's warranty.  Glass, D.E. 2-63, pp. 23-24.

The Roscioli Yachting Center, represented by Glass, would not warrant a paint job that painted over the coatings that Horizon had previously applied, at least in part because of the passage of time and opportunity for oxidation under normal circumstances.  See D.E. 2-63, pp. 58-61.   Specifically with respect to the dangers of oxidation, Glass testified that the paint system allows no more than hours between coats.  D.E. 2-63, pp. 39-40.  If there is a delay of months, then the process would have to start over.  *Id*.  Rain, sun, and debris, as much as launching, would require remedial work before the paint system could be re-applied and become eligible for the paint manufacturer's warranty. D.E. 2-63, p. 40.  Connell agreed with Glass that no one should paint over a vessel that has been sitting for over two years.  D.E. 2-64, p. 279.

Other than exposing the vessel to barnacles that required additional sandblasting, BLyn supplied no evidence that custodial mismanagement damaged the paint work any more than did the passage of time after the stop work order—if the fairing job required by BLyn were to be accomplished.  Horizon, as a custodian, cannot be penalized for the fact that the fairing was incomplete when BLyn issued its stop work order.  *Scotiabank, supra*.  Thus the only repair figure that was properly related to custodial damage in the Exterior category was the additional $9,500 amount for the bottom sandblasting.

**Interior.**   Because of the unsealed manner in which the Betty Lyn II was maintained in the shipyard and exposed to the elements, the interior insulation and plywood panels had gotten wet in some places and showed evidence of mold, mildew,

and insect infestation that had to be cleaned out.  Glass, D.E. 2-63, p. 43-44.  Included, was debris, sand, mud, dirt, and corrosion.  D.E. 2-63, pp. 45-46.  Clearly, the testimony supports the entries in the report for "insulation removal" of $10,200 and "cleaning and treating" of $13,600.

There are references to removal of wiring and piping as being necessary to gain access to the areas that needed to be cleaned.  Glass, D.E. 2-63, p. 47; Glass Proffer, D.E. 2-41, p. 4; Report, D.E. 2-41, p. 11.  There is, however, no testimony as to how the calculation of the repair cost for the wiring and piping entries differed from the calculation for the "cleaning and treating" entry.  Moreover, the bulk of the testimony that related to wiring and piping was with respect to making the work conform to ABYC or ABS codes and practices that govern ship-building—a matter unrelated to custodial care.  In fact, Glass anticipated removing the wiring in his original 2009 proposal—before the vessel was launched and its condition deteriorated.  Glass, D.E. 2-63, pp. 88-90.

When the Bankruptcy Court sought to clear up the matter of wiring and piping removal costs, Glass said that the work was required to conform to code and that the increase from his 2009 proposal to 2010 was due to better inspection and determination of what needed to be done.  D.E. 2-63, pp. 89-90.  Likewise, Conell's testimony regarding wiring, plumbing, and piping had only to do with whether it was up to code.  D.E. 2-65, pp. 5-6.  Thus, BLyn has not demonstrated that the wiring and piping removal entries on the repair estimate are sufficiently related to custodial damage.  Instead, the

work would have had to be done in any yacht refit ultimately intended by BLyn and Roscioli.

Interior painting appears to be related to the condition of the engine room.  D.E. 2-41, p. 11.  There is reference in Glass's report to substantial corrosion of the equipment, the need to remove it, clean it, and paint the engine room before reinstalling the engines and related systems.  *Id*.  Thus there is some evidence to include the interior painting work at $65,000 in the calculation of custodianship-related damages.

**Aluminum Repairs.**  With respect to aluminum repairs, the Glass report states that two areas of stress cracks in the aluminum "***could be*** from improper and prolonged blocking of the vessel on the soft surfaces of the ground where the vessel sits."  D.E. 2-41, p. 11 (emphasis added).  Robert Connell specifically testified that the cause of the cracks was unknown, but he thought it was due to defective work (as opposed to neglectful care).  D.E. 2-64, pp. 272-73.  An expert's speculation is not evidence.  *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (expert opinion must be "grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief").

Nothing else in the report or the experts' testimony relates the aluminum repairs to custodial wrongdoing.  Indeed, the reference to aluminum construction in Glass' proffer involve matters "which will have to be reworked due to improper manufacture or installation by Crimson Yachts."  D.E. 2-41, p. 4, ¶ 7.  This is obviously not a custodial care issue.

**Storage/Shed Rental and Insurance.**  BLyn has supplied no explanation of the need for storage or shed rental and how that relates to the work required to remedy any damages resulting from a breach of the custodial duty of care.  For instance, if expenses for the rental is incurred by the time needed to effectuate repairs and the time needed for the repairs related to custodial damage is less than the time needed for all of the repairs Glass included in his estimate, then that figure would have to be reduced *pro rata* if allowed.  Likewise, the basis for the Shiprepairer's Legal Liability Insurance (S.R.L.L.I.) is not explained and thus the Court does not have a basis for allowing it in its entirety.  Neither is there a basis in the evidence on which to calculate any specific reduction.

**The Damage Award.**  The Bankruptcy Court's award of $1,000,000 is not detailed.  All of  the damages testimony relates to the Glass report.  As detailed above, the report does not support an award of that magnitude.  Neither does BLyn articulate in its briefing any other basis for finding damages of that scale having a causal nexus to the custodianship.

While there was abundant evidence that Horizon's work during the contract period did not conform to necessary standards and would have to be reworked, those damages are not properly assessed in the context of a claim for breach of the duty of a substitute custodian.  Moreover, the Bankruptcy Court's equity jurisdiction does not eliminate the elements of proof and evidentiary standards applicable to a cause of action against a substitute custodian.  *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt., Inc.)*, 4 F.3d 1329, 1333-34 (5th Cir. 1993); *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986); *Adams v. Jones*, 11 F.2d 759 (5th Cir.), *cert. denied*, 271 U.S. 685, 46

S.Ct. 637, 70 L.Ed. 1151 (1926); In re Young, 416 Fed. Appx. 392, 398, 2011 WL 679427, *5 (5th Cir. 2011) (*per curiam*).

This Court is left with the definite and firm conviction that a mistake has been made.  The Court **SUSTAINS** Horizon's Issue 3, which challenges the sufficiency of the evidence to support the Bankruptcy Court's award of $1,000,000 to BLyn for Horizon's breach of custodial duty.  The Court **SUSTAINS** Horizon's Issue 4, which challenges the elements of damages to be awarded for breach of the duty of a substitute custodian. Pursuant to Bankruptcy Rule 8013, the Court **MODIFIES** the award against Horizon and in favor of BLyn on the claim for breach of the duty of a substitute trustee to the following:

| Exterior | Bottom | $   9,500.00 |
|---|---|---|
| Interior | Insulation removal | 10,200.00 |
|  | Cleaning and treating | 13,600.00 |
|  | Painting | 65,000.00 |
|  |  |  |
| Subtotal |  | 98,300.00 |
|  |  |  |
| Sales Tax |  | 5,898.00 |
| Total |  | $104,198.00 |

## C. Horizon Is Not Entitled to Custodial Expenses

Horizon further challenges the Bankruptcy Court's denial of its custodial expenses for storing the Betty Lyn II during this litigation.  Horizon, as the party seeking to include certain expenditures as expenses *in custodia legis* bore the "burden of proving that the costs were equitably incurred."  *Nat'l Bank of N. Am. v. S.S. Oceanic Ondine*, 315 F.Supp. 386, 388 (S.D.Tex. 1970).  The Bankruptcy Court determined that "Horizon's

failure to care for the Vessel in a reasonable manner prevents it from recovering storage

fees." Findings of Fact, D.E. 2-71, pp. 12-13, ¶ 43.

Horizon's claim is clearly one invoking the equity power of the court. With

respect to the assessment of expenses *in custodia legis*, it is said that

> The court of admiralty is asked, in the exercise of its
> admiralty jurisdiction, to administer the fund within its
> custody in accordance with equitable principles as is its wont.
> It is defraying from the proceeds of the ship in its registry an
> expense which it has permitted for the common benefit and
> which, ***in equity and good conscience***, should be satisfied
> before the libelants may enjoy the fruit of their liens.

*New York Dock Co. v. The Poznan*, 274 U.S. 117, 121-22, 47 S.Ct. 482, 71 L.Ed. 955

(1927) (emphasis added); *see also Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351,

353 (5th Cir. 1997) ("At the judicially ordered sale, the cost of maintenance is deducted

from the sale proceeds before the remaining proceeds are divided among the claimants.

Therefore, even when a single litigant advances the cost of maintenance, all claimants are

eventually required to share in this cost.").

This Court's review of the Bankruptcy Court's equitable determination is under

the abuse of discretion standard. In *In re Coastal Plains, Inc*., the Fifth Circuit explained

the standard of review applicable to a bankruptcy court's determination of an issue in

equity as follows:

> Because judicial estoppel is an equitable doctrine, and the
> decision whether to invoke it within the court's discretion, we
> review for abuse of discretion the bankruptcy court's rejection
> of the doctrine.  *See, e.g.*, *Ergo Science, Inc. v. Martin*, 73
> F.3d 595, 598 (5th Cir. 1996).

>"[A]n abuse of discretion standard does not mean a mistake of law is beyond appellate correction," because "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100, 116 (1996).   Accordingly, "[t]he abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id. See also Latvian Shipping Co. v. Baltic Shipping Co.*, 99 F.3d 690, 692 (5th Cir. 1996) ("We will not find an abuse of discretion unless the district court's factual findings are clearly erroneous or incorrect legal standards were applied"); *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 535 (5th Cir. 1996) ("[a court] abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence").

179 F.3d 197, 205 (5th Cir. 1999), *cert. denied*, *Mims v. Browning Mfg.*, 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000).

Travis Short, President of Horizon, testified in one paragraph of his proffer regarding these expenses.  He testified that the daily fee of $195, plus climate controlled storage for the wood interiors, insurance "and the like" are detailed in Horizon Exhibit 281 and total $411,925.72.  Exhibit 281 contains no detail to describe what is included in the daily vessel storage fee.  Neither does it provide any clue as to what is involved in the "miscellaneous" and "labor" charges Horizon seeks.

At trial, Travis Short's testimony on the matter was in the following terms:

>Dry storage is, from the time that the boat contract was terminated, we charged a daily storage fee, price per foot.  I think it was $195 a day for keeping the boat out of harm's way on the hill, and, basically, security and all the other small little overhead charges, that you've got to go up and check the boat from time to time, et cetera, et cetera.  But it's a normal fee or a normal rate that shipyards or storage areas charge for taking up space and acreage in a facility.

D.E. 62, p. 138.   The Bankruptcy Court agreed with Horizon that a reasonable and customary fee for the storage of a vessel is $195 per day.   Findings of Fact, D.E. 2-71, p. 12, ¶ 43.   However, the court denied the expenses *in custodia legis* in their entirety on the basis that Horizon breached its duty as a substitute custodian.   This Court agrees.

In rejecting many of BLyn's damage claims against Horizon, this Court was concerned with the lack of evidence of a causal nexus between Horizon's conduct and the repairs sought.   That does not mean that this Court is blind to the neglect and poor treatment that the Betty Lyn II endured at Horizon's hands.   Here, Horizon's inadequate custodianship is directly related to its entitlement to the charges it seeks.

While the vessel did take up space in the Horizon shipyard (with the exception of the three months it was in the water outside the yard's perimeter), it was not out of "harm's way."   It was unprotected in the elements and it was in close proximity to other shipyard work that caused dirt and debris to infiltrate the interior and become embedded in its aluminum hull.   The evidence reflects that it was not properly secured and there is no indication of a regular schedule for checking on it.   The vessel was launched without adequate protection of its materials—interior or exterior.   It was further docked in a precarious manner without adequate fenders, without fire suppression, without proper bilge pumps, and without security.   It was poorly cleaned when returned to drydock and the coverings of windows and doors that were inadequate to start with were permitted to deteriorate, leaving the interior especially vulnerable to damage from heat and humidity. The Bankruptcy Court did not abuse its discretion in denying the $195 per day storage fee.

At first blush it would appear to be a foregone conclusion that Horizon should recoup the out-of-pocket expense of supplying climate-controlled storage for the more delicate equipment and furnishings that had not been installed on the vessel prior to the stop work order.   However, there is evidence that some of that delicate material was installed and thus was left in a non-controlled climate.   There is also evidence that the equipment and furnishings had been partially removed from their packaging and left in disarray inside the storage containers, eliminating at least some of the protection that should have been afforded to those items in connection with that storage.   The Bankruptcy Court did not abuse its discretion in denying Horizon recovery of these storage charges.

That leaves the question of insurance on the vessel and the unexplained labor and miscellaneous charges.   Horizon argues that the Refit Contract required that Horizon carry the insurance.   However, the Refit Contract was terminated prior to Horizon taking custody of the vessel after its arrest.   Expenses allegedly incurred by contract are not necessarily proper expenses *in custodia legis*.

The parties argue over whether a denial of expenses *in custodia legis* provides a windfall to BLyn.   This is not a question of a windfall, but whether Horizon showed itself to have an equitable right to be compensated as a custodian.   Given its appalling failure to protect and safeguard the vessel, Horizon has not met its burden.   The Court finds that in equity and good conscience such expenses should not be passed along to any other claimant in this case.   Horizon acted only at its own convenience and the vessel's greatest

threat was Horizon, itself.  The Bankruptcy Court did not abuse its discretion in denying Horizon any recovery for its expenses as custodian of the Betty Lyn II.

This Court **OVERRULES** Horizon's Issue 5, by which it seeks an award of custodial expenses, and **AFFIRMS** the judgment denying Horizon any recovery for expenses *in custodia legis*.

### D. The Bankruptcy Court Was Correct in Its Treatment of Contract Claims

In two cross-points, BLyn challenges the Bankruptcy Court's findings insofar as they fail to find that Horizon had breached its contract with BLyn and overcharged BLyn for time and materials (more than the $30,000 that the Bankruptcy Court did award) or that Horizon owes BLyn for necessary repairs due to shoddy work and/or poor custodial care, and for the completion of the Betty Lyn II as a yacht.  Because there was sufficient evidence to support the Bankruptcy Court's findings, this Court does not find that they were clearly erroneous and affirms the judgment on BLyn's contract claims.

#### 1.  Horizon's Alleged Overcharges

BLyn represents its evidence on overcharges to be "uncontroverted."  BLyn Brief, D.E. 4, p. 31.  However, after review of the entire record, it is clear that there is substantial controverting evidence.  Both Travis Short (Horizon's President) and Ben Forrest (Project Manager for Crimson Yacht's refit of the Betty Lyn II) testified at length as to their interpretation of the contract, the manner in which time and materials were furnished, and the documentation of the charges, along with BLyn's review, approval, and payment of the invoices.  Captain Doug Dardeau, who was assigned by BLyn to be its on-site representative, and who was charged with ensuring that time and materials

were provided as billed, testified that he reviewed the invoices, requested and obtained adjustments where necessary, and signed off on them as properly payable by BLyn pursuant to the contract and change orders.

BLyn's briefing suggests that the Bankruptcy Court was bound by the testimony of Vicky Gregorcyk, a licensed C.P.A. because she was the only expert to testify as to an audit of Horizon's billings. However, the factfinder is not bound by the testimony of any expert, even if uncontroverted. *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627-28, 64 S.Ct. 724, 729, 88 L.Ed. 967, 973 (1944); *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 204 (5th Cir. 1995).

In part, this cross-point challenges whether the charges were consistent with the contract. The ultimate decision on how a contract is interpreted is a question of law for the court. *E.g., Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 712 (5th Cir. 2005). Ms. Gregorcyk did not have any legal credentials and, even if she did, her testimony is not admissible on a question of law. *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996), *cert. denied*, 522 U.S. 821, 118 S.Ct. 77, 139 L.Ed.2d 36 (1997) (CPA's testimony on question of law was not admissible under Fed. R. Evid. 704 as it merely constituted advocacy).

To the extent that Ms. Gregorcyk's criticism of Horizon's charges is based on her conclusions regarding what the contract required, they are of no consequence. Thus, her testimony regarding project management, marine architect, and operator rigger expenses,

storage fees,[3] as well as charges for materials need not be credited.[4]  The same is true of her challenge of certain rates for labor and some equipment charges, which she analyzed as a matter of contract interpretation.  This eliminates the third, fourth, fifth, sixth, seventh, eighth,[5] and tenth alleged overcharges briefed by BLyn.  Likewise, the challenge labeled "change order overruns," item nine on the list, is a matter of contract interpretation.  Like the original contract, all change orders were done on a time and materials basis, so Horizon was not bound by the estimates stated in the change orders, meaning that there is no contractual penalty for exceeding estimates.

Going back to the first alleged overcharge on Gregorcyk's list, she challenges "unsupported time" on the basis of a lack of time sheets or subcontractor invoices.  This is an accounting or auditing issue.  Whether the charges would survive an audit is not the test for whether they were properly made and paid.  Given Short and Forrest's testimony that the work was done and Dardeau's testimony that he reviewed all charges on behalf of BLyn and approved them for payment, this challenge does not reveal any clearly erroneous findings by the Bankruptcy Court.

The second listed overcharge addresses the treatment of the work done by Elite Yacht Coatings personnel.  Horizon's evidence was that it negotiated to place the Elite

---

[3]  Horizon represents that the storage fees at issue were *in custodia legis* expenses and have nothing to do with the contract issues.  D.E. 6, p. 9.  BLyn does not dispute this.  Thus this is an additional reason to reject this claim of overcharge.

[4]  The alleged overcharges are set out in bulleted fashion in BLyn's Brief, D.E. 4, p. 32.  The Court will reference them by number in the order in which they are set out in the Brief.  The eleventh item on BLyn's list does not have a damages amount associated with it and thus does not require discussion.

[5]  Additionally, at trial, she admitted that the amount of her challenged expenses in the eighth item had to be reduced by $158,457.46 because Horizon had since provided some supporting documentation.  Yet on appeal, BLyn is still claiming the original $934,801.32.  Compare BLyn Ex. 95 and 129.  There was also evidence that her standards for what constituted adequate documentation were too high.  *E.g.*, D.E. 2-64, pp. 172-79.

personnel on its payroll to be billed to BLyn at its own labor rates rather than subcontract the work.  The objective was to reduce the cost to BLyn of fairing the vessel by having Horizon cover the materials and supplies as well as the insurance cost for labor, thereby cutting out a large portion of what Elite would have charged on a subcontract basis. Because there was evidence to support a finding that BLyn agreed to this arrangement in a change order (Horizon Ex. 3, p. 39), Gregorcyk's critique does not show the Court's denial of this claim to be clearly erroneous.

While Alabama law does not permit damages based upon speculation, the evidentiary proof provided in Horizon's Exhibits 17-63 and 69-71, along with the testimony of the parties as to the documentation provided to support each invoice and BLyn's review and approval process as supported by the testimony of Doug Dardeau is sufficient to support the Bankruptcy Court's findings and conclusions regarding these claims of overcharges.  *See generally*, *Industrial Chemical & Fiberglass Corp. v. Chandler*, 547 So.2d 812 (Ala. 1988).

The Court **OVERRULES** BLyn's cross-appeal Issue 1, in which BLyn seeks reimbursement for Horizon's alleged overcharges, because the Bankruptcy Court's treatment of Gregorcyk's challenges to Horizon's charges is not clearly erroneous.

### 2.  Horizon's Alleged Breach of Contract and Resulting Damages

In its second issue on cross-appeal, BLyn argues that the Bankruptcy Court erred by failing to find that Horizon's "inept and/or substandard" work was tantamount to a breach of contract.  Under this second cross-point, BLyn seeks reimbursement of the overcharges sought in Cross-Appeal Issue 1, which have been denied above and will not

be considered anew.  BLyn further seeks repair costs of $1,311,560 and completion costs of $5,200,000.

In support of this issue, BLyn points to testimony regarding damage done during the custodianship.  That, of course, is not a matter of Horizon's contract performance but of its breach of its duty as a custodian.  That claim has already been addressed in this Opinion and will not be revisited.  That is not to say, however, that the repair costs that were denied as being unrelated to the custodial damage cannot be awarded as a matter of breach of contract.

So the question before this Court is whether the evidence of BLyn's complaints about the work done during the contract period demonstrates that Horizon breached the contract and that a contrary finding is clearly erroneous.  Just as custodial damage is not relevant to this inquiry, the Court must disregard complaints related to ordinary deterioration during the custodianship and allegations related to the fact that the work was stopped before it was complete.  In its Brief, BLyn relies exclusively upon Glass's report and proffer.  Glass's complaints, and the Court's analysis are as follows:

    a.  Launch and Barnacles.  This is a matter of custodial damage that is not to be included in this contract analysis.

    b.  Exterior Surface Paint.  There was substantial evidence that, in order to get a good bond with the paint and to obtain a warranty on the job, the paint process had to be restarted because of the passage of time and ordinary oxidation that would have happened under any circumstances.  This testimony came from BLyn's own witnesses.  *E.g.,* Glass Testimony, D.E. 2-63, pp. 59-60; Connell

Testimony, D.E. 2-64, p. 279.  This is related to the stop work order and is not to be included in a contract analysis.

c.  Cleaning and Treating.  The charges for this work were awarded for custodial damage and are otherwise related to the stop work order and the time that the vessel has been in storage during litigation.  This does not reflect any breach of contract.

d.  Aluminum Construction Work.  BLyn complains that elements of the aluminum installation need to be reworked due to improper manufacture or installation.  When addressing the detail of the claim, Glass refers to such things as the positioning of doors, incomplete installations, conflicts in design elements, and stress cracks.  Horizon's evidence showed that it simply followed the architectural drawings provided by BLyn and is not responsible for the design.  There was also evidence that some of these complaints, such as the stress cracks would have been addressed in the completion work had Horizon been permitted to finish it.  Thus there is evidence to support a finding that these complaints are not the result of any breach of contract.

e.  Piping and Wiring.  As discussed in the context of the custodial damage claim, this complaint comes down to allegations that the installation violated codes and practices of the American Bureau of Shipping and the Safety Code of Practice For Large Yachts.  Horizon's evidence showed that the wiring of the electrical panel was permitted because it was not in a wet area and that wire chafing issues would have been dealt with had Horizon been permitted to

finish its installation with rubber insulation that would have been added.  There was also evidence that the pipe-related issues were related to BLyn's changing design needs.  Thus, the Bankruptcy Court's refusal to find a breach of contract in this regard is not clearly erroneous.

Without fully briefing its argument, BLyn asserts entitlement to the completion costs of $5,200,000.  A failure to provide legal authorities in support of an issue waives it.  *E.g*., Fed. R. App. P. 28(a); *L&A Contracting Co., supra*; *Dardar, supra*.  Moreover, Horizon did not have a contractual obligation to complete the Betty Lyn II refit for the amount already paid, thereby incurring the cost of completion.  Instead, BLyn had agreed to a time and materials contract and stopped work before the time was up and without paying for all of the time and materials already charged.  BLyn prevented completion and Horizon properly terminated the contract.

The Bankruptcy Court's failure to find that Horizon breached the contract with BLyn and failure to award contract damages is not clearly erroneous.  The Court **OVERRULES** Issue 2 of BLyn's cross-appeal seeking repair and completion costs for Horizon's alleged breach of contract and **AFFIRMS** the judgment as to the contract-related findings and conclusions.

For the reasons set out above, the Bankruptcy Court's judgment is MODIFIED.

Horizon is thus entitled to judgment as follows:

| | | |
|---|---|---|
| Unpaid Invoice (Nos. 9443-9447) | | $679,700.52 |
| 10% Retention (See Invoice No. 9447) | | 475,916.86 |
| | Subtotal | 1,155,617.38 |
| Interest at 6% from 5-23-08 to Date of Judgment[6] | | 218,269.20 |
| | Subtotal | 1,373,886.58 |
| Less Credit for Overcharge | | 30,000.00 |
| Less Credit for Deposit | | 180,000.00 |
| | Subtotal | 1,163,886.58 |
| Less Offset for Custodial Damage | | 104,198.00 |
| | TOTAL | $1,059,688.58 |

ORDERED this 16th day of July, 2012.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

---

[6]  The contract contains a choice of law provision stating that it is governed by the law of Alabama.  D.E. 2-51, p. 28.  Under Alabama law, the maximum rate of interest where no rate is specified in the contract is six percent.  Ala. Code 1975 § 8-8-1.  Post-judgment interest is determined by federal law.  28 U.S.C. § 1961(a); *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 7 F.3d 1203, 1209 (5th Cir. 1993).